# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | | |
|---|---|---|
| **BOBBY RAY INGRAM, II** | * | **CIVIL ACTION NO.  12-3111** |
| **VERSUS** | * | **JUDGE S. MAURICE HICKS** |
| **JERRY GOODWIN, WARDEN DAVID WADE CORRECTION CENTER** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Petitioner Bobby Ray Ingram, II filed a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on December 18, 2012.  [doc. # 1].  Respondent responded to the *habeas* petition on March 11, 2013.  [doc. # 7].  Petitioner, an inmate in the custody of Louisiana's Department of Public Safety and Corrections and incarcerated at the David Wade Correctional Center in Homer Louisiana, attacks his Manslaughter conviction.  This matter has been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the Court.

## BACKGROUND

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal:

> Ingram and his first wife, Kim, were married for 14 years and had three children. The couple divorced in 2002, and initially they shared the physical custody of their children. In 2006, Ingram remarried; he and his new wife, Nancy Ingram, had one child together. They lived in a rural area north of Minden in the same home where Ingram and Kim lived during their marriage.

> Testimony established that Ingram and Kim had a contentious relationship. As a result, Kim was not allowed onto the Ingrams' property, and this acrimonious situation led Ingram and Nancy to build a gate, and then a fence, between the highway and their property. Custodial exchanges of the children were done while

1

Kim was parked outside the gate near the road.

On the morning of Wednesday, October 18, 2006, Ingram and Nancy were in Shreveport shopping for a new car. They returned home early that afternoon to a letter they received from Ingram's attorney relaying new demands from Kim concerning various custody and property matters. In the letter, Kim asked for sole custody of their daughter, her portion of Ingram's 401K account accrued during their marriage and the return of some  personal property. In response, Ingram called Kim at her workplace. He told Kim that he withdrew his previous consent to an informal request by Kim to take their youngest child to Kim's high school reunion on the upcoming weekend, a weekend when he would normally have physical custody of the child. He also told Kim that he was not going to be able to give their oldest son a car because he would need additional money to pay a lawyer to fight Kim's demands. Reportedly, Kim asked Ingram to keep the children out of their disputes.

After this call ended, Kim then called Ingram's residence seven times from 1:15 p.m. until 1:58 p.m. Nancy and Ingram ignored most of these calls, but finally Nancy answered the phone, at which point Kim demanded to know the whereabouts of her oldest son who was living with Nancy and Ingram. Nancy told Kim that the young man was not there. Nancy testified that Kim said that when she was finished with her client (Kim was a hairdresser in Minden), she would be on her way to see Nancy and Ingram. Neither Nancy nor Ingram went out to lock their gate; Nancy testified that she did not do so "because of numerous times she threatened me she didn't follow up on it after I had her arrested at my salon."

About twenty minutes later, Kim drove up to the Ingram's home and parked at the end of the driveway near the highway. When she arrived, Kim called the house again and Nancy answered the phone. Nancy testified that "She [Kim] said she was going to wait at the end of the driveway until I left and then she--once I got on public property she was going to kick my ass." Nancy then told Kim to "come on down the driveway." Nancy testified that she made this statement to Kim in an effort to have Kim arrested for threatening her. Kim waited in her car at the end of the driveway for several minutes and then Nancy called Kim back and told her to leave. At that point, Kim told Nancy that she was going to wait there until her oldest son arrived home on the school bus. Nancy testified that Kim demanded that Nancy come out to her "so she could kick [Nancy's] ass."

Kim then drove her car down the Ingrams' long driveway and skidded to a stop in the front yard only a few feet from the front door. Kim got out of her car, leaving her purse inside and leaving the driver's side door open, and came up onto the front porch of the Ingrams' residence. Nancy saw Kim through a front window and called out to Ingram, who was in the kitchen, saying "She's here."

The Ingrams' front entranceway had two doors: a glass storm door and a wooden main door. The wooden main door was open, and the storm door was shut. Nancy

2

testified that she walked up to the storm door and cracked it open "a few inches" to speak with Kim. Nancy testified that she never left the residence. At this time, according to Nancy, Kim was standing outside the house on the front porch but at the storm door. When Nancy opened the storm door, she said to Kim "I've had it," and Kim responded "I've had it." Nancy testified that she and Kim then called each other "bitches," that Kim called Nancy a whore, and that Nancy told Kim to leave. Nancy never saw Kim with a weapon.

In the meantime, Bobby Ray called 911; the call was received at 2:45 p.m. An audio recording of this conversation was admitted into evidence along with two different transcripts. Phone records show that the Ingrams received a call from a car dealership immediately thereafter, which call only lasted a few seconds and then disconnected.

During Nancy and Kim's argument, the dispute became physical, and the women began fighting on the floor inside the house at the threshold just inside the front door. Nancy testified that Kim knocked her to the floor and then proceeded to hit Nancy and pull her hair. At trial, Nancy further explained that Kim was on top of her and that she (Nancy) was trying to protect her face by putting her arms up.

Ingram testified that he was still in the kitchen on the phone when he heard Nancy make "a blood-curdling scream" and heard "a loud bang" so he hung up with 911 and grabbed the deer rifle that had been left in the kitchen after a recent hunt. He said he went into the hallway where he saw the two women on the floor. He said that "She (Kim) was holding her (Nancy) with one hand and hitting her with the other, and Nancy was screaming." At that point, Ingram called out to Kim. Ingram testified:

> I didn't think, I just, I ran, I grabbed her [Kim], I think I was screaming "get off of her, get off of her, get out." I grabbed her [Kim] by the hair and I pulled up, and when I pulled up, I guess she pulled up on Nancy and Nancy screamed louder and I let go and it got her attention off of Nancy, and then she lunged at me and I was pulling back and I fired.

Ingram further explained that "[W]hen I [let go], Kim turned up and lunged towards me, or made an aggressive motion towards me, and I pulled back and I fired." He said that the rifle was at his hip when he fired. Nancy said that she wasn't able to see up until Ingram pulled Kim up and off of her; she explained that when she was finally able to see, she saw only her husband's side and the rifle. Nancy testified that, "I saw Bob's eyes got big like he got scared and jump, jumped back, and I felt pressure back on my legs like maybe she [Kim] was coming forward, and then the gun went off." During the investigation on the day of the shooting, Nancy denied seeing Kim reach for the gun.

The bullet struck Kim in the bottom of her right arm, perforated the arm and entered her upper right torso through her right breast. The bullet destroyed the breast implant

in that breast and then traveled upward through her torso into her heart. The bullet fragmented and did not exit her body. Kim Ingram was dead.

Immediately, Ingram called 911; the call was received at 2:46 p.m.-only one minute after the first call was received. His first statements to the dispatcher were: "Yeah, she came in the house and she started fighting and I shot her! I need an ambulance quick!" Nancy took the phone from Ingram and relayed to him instructions from the dispatcher about giving CPR. Neither he nor the paramedics who arrived shortly after the 911 call were able to revive Kim.

During the second conversation with 911, the dispatcher asked Nancy if she was injured, to which Nancy replied "[S]he came in and attacked me, I mean, I might have some scratches on me but I'm not injured." Subsequent photos of Nancy showed that she had what appears to be fingernail scratches on her upper chest.

The photos of Kim taken at the scene show her body entirely within the home, at the front door, lying on her back with her  head near the door. She has what appear to be small pieces of tissue covering her jeans from her waist down to her knees. The photos also show that the front of the right leg of Kim's jeans was wet from her upper thigh down to her knee.

*State v. Ingram*, 47 So. 3d 1127, 1128-31 (La. App. 2 Cir. 2010)*.*

Petitioner was indicted for second degree murder on November 20, 2006. [doc. # 7-1, p. 29].  Petitioner's first jury trial ended in a mistrial prior to the submission of the case to a jury due to the inability of defense counsel to proceed for health reasons.  *Id.* at 220.  In the second jury trial,  Petitioner was found guilty of the lesser included offense of Manslaughter with ten of twelve jurors voting for conviction.  [doc. # 7-5, p. 102].  Petitioner filed post-trial motions for acquittal and for a new trial, which were denied.  *Id.* at 209, 213.  On December 3, 2009, Petitioner was sentenced to twenty-eight years imprisonment at hard labor.  *Id.* at 252.

On May 19, 2010, Petitioner filed an appeal to the Second Circuit Court of Appeal, in which assignments of error were briefed regarding (1) insufficient evidence; (2) trial court error by allowing into evidence the results of a purported drug test even though the state did not call the analyst who performed the test; (3) Petitioner's constitutional right to an impartial jury was denied because of juror misconduct and jury bias; (4) trial court erred by denying the motion for

a new trial based on state's use of an altered transcript of the 911 call; (5) lack of a requirement of unanimous verdict denied Petitioner his fundamental right to trial by jury; and (6) excessive sentence. *Id.* at 172. The Louisiana Second Circuit Court of Appeal reversed the trial court's decision on the issue of juror misconduct, finding that "[t]he instant case is a strikingly atypical case of jury misconduct," and ultimately, the appellate court remanded the matter to the trial court for an evidentiary hearing. *Id.* at 427. Thereafter, the state filed a writ application to the Louisiana Supreme Court, arguing that the appellate court erred in remanding the case for an evidentiary hearing. *Id.* at 311. In a 5-2 opinion, the Louisiana Supreme Court granted writ and reversed, finding that Petitioner was not entitled to an evidentiary hearing on the juror misconduct issue, and remanding the case to the Second Circuit to consider Petitioner's remaining assignments of error. *Id.* at 295. On remand, the Second Circuit rejected Petitioner's remaining assignments of error. *Id.* at 467. On January 11, 2012, the Louisiana Supreme Court affirmed the appellate court's decision by a vote of 6-1. *State v. Ingram*, 77 So. 3d 947 (La. 2012). Petitioner did not seek collateral review in state court.

Petitioner filed the instant Petition on December 18, 2012, arguing: (1) he was denied his right to an impartial trial by jury because of juror misconduct; (2) he was denied the right to confront a key witness against him; (3) there was insufficient evidence to convict him beyond a reasonable doubt; and (4) he was convicted by a non-unanimous verdict in violation of the Constitution. [doc. # 1].

## LAW AND ANALYSIS

### I.    Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is

limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).  An inmate must show that the adjudication of the claim in state court

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as

opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court

may grant the writ only if the state court "identifies the correct governing legal principle from . . .

[the Supreme Court's] decisions but unreasonably applies the principle to the facts of the

prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal

courts presume such determinations to be correct; however, a petitioner can rebut this

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e).

## II.   Petitioner's Claims

A. Claim One: Jury Bias

> *i. Facts and Procedural History*

Petitioner claims that the Louisiana Supreme Court's decision violated clearly established

federal law because he was denied an impartial trial by jury as guaranteed by the Sixth

Amendment and the Due Process Clause of the Fourteenth Amendment.  [doc. # 1, p. 18].

Specifically, Petitioner alleges that "[t]he right to be tried by a jury whose members are free from

bias is clearly established law, as determined by the Supreme Court of the United States."  *Id*.  In

response, Respondent adopts the opinion of the Supreme Court of Louisiana.  [doc. # 7, p. 13].

The facts and procedural history relating to Petitioner's claim are set forth by the

Louisiana Supreme Court:

> Following the jury's verdict of manslaughter . . . defendant filed a motion for a new
> trial based in part on an affidavit executed by the jury foreman regarding the course
> of jury deliberations. The foreman generally expressed concerns about certain aspects
> of the deliberations but specifically focused on a juror identified by the court of
> appeal in its decision as Juror No. 8. The affidavit stated that during recesses as the
> trial proceeded, Juror No. 8 had informed other jurors on the panel that she suspected
> her boyfriend was having an affair and was taking advantage of her service on the
> jury to visit his paramour. Acting on her suspicions, Juror No. 8 had armed herself
> with a baseball bat over a noon lunch recess during the evidentiary portions of the
> trial and "made an unauthorized entry into the house of the alleged paramour." She
> found her boyfriend in bed with the woman. Juror No. 8 told the woman to remain
> still and listen to her. She also informed her boyfriend that she would deal with him
> later. The confrontation apparently ended at that point. The jury foreman further
> explained in his affidavit that Juror No. 8 "acknowledged to him and others that she
> had placed herself in the same position as Kimberly Ingram, as both had entered
> homes without authority." Finally, the foreman alleged that the incident allowed the
> other jurors to have "the benefit of a 'recreation' of the crime, and more importantly,
> allowed them to use this evidence in its deliberation to compare the juror's position
> at the house she entered to that of Kim Ingram; i.e., the juror lived; Ms. Ingram did
> not."
>
> * * *
>
> The trial court denied [Petitioner's] motion without conducting a hearing on the
> claim. The trial court assumed for purposes of ruling on the motion that the
> allegations in the foreman's affidavit were true, although the prosecutor would not
> subscribe to that view because "[t]hat's not we had been reported as actually
> occurred." The court found that as alleged in the affidavit, Juror No. 8 had simply
> "relayed a personal experience and not some extrinsic facts that could be construed
> as an extraneous or an outside influence," for purposes of Louisiana's jury shield
> provisions in La. C.E. art. 606(B), which generally preclude inquiry into the course
> and conduct of a jury's deliberations, but which make exceptions for cases in which

7

"any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention."

The court of appeal flatly disagreed with that assessment and remanded the case to the district court to conduct an evidentiary hearing on the allegations in the foreman's affidavit. For the Second Circuit panel, the present case offered "a strikingly atypical" example of juror misconduct because "a juror allegedly committed a crime during the course of the trial, which crime was reminiscent of the facts of the case being tried," and then related the incident to the rest of the jurors, thereby calling the jury's fact-finding process into serious question. The panel therefore concluded that it was worth breaching the jury shield rule of La. C.E. art 606(B) to establish the full facts of the incident and the extent to which it became the focus of attention during deliberations, although ultimately defendant might not be entitled to any relief, because the costs of conducting such a hearing appeared far less than the costs to public confidence in the criminal justice system if the hearing were not conducted. At the same time, the court of appeal did not address the scope of the evidentiary hearing it ordered. In fact, the defense proffer submitted at the hearing on the motion for a new trial listed only a single juror that the defense had intended to call at the hearing, Juror No. 8, whom counsel identified by name.

*Ingram,* 57 So. 3d at 301-02.

As stated above, the Louisiana Supreme Court reversed and remanded the appellate court's decision.  The majority opinion relied on the Louisiana jury shield rule (La. C.E. art. 606(B)) and held that even if a hearing established the truth of the foreman's affidavit, Juror No. 8's (Ms. Hudson) conduct "did not give rise to a reasonable possibility that the information she conveyed contributed significantly to the jury's verdict."  *Ingram*, 57 So. 3d at 304.  The court found that "[r]easonable jurors would not have understood [Hudson's] conduct as an attempt to recreate the crime charged against defendant, as she had clearly acted on her own impulses in her own private life."  *Id.*   In fact, the court determined that Hudson's "personal experience shared with jurors focused attention on the evidence offered at trial, and on the critical question posed by the defense of the case, whether the conduct of Kimberly Ingram after she crossed the threshold of defendant's home gave rise to a reasonable belief" that Petitioner was acting in self-defense.  *Id.*

8

Notably, in a brief dissent, Justice Weimer opined that "[t]he juror in this case was caught in a conflict between her duty as a juror and her self-interest which potentially compromised her ability to render a fair and impartial verdict in a proceeding brought by the district attorney, who could evaluate whether to charge her with one or more offenses." *Id.* at 306.  Justice Weimer concluded that the court of appeal was correct in ordering an evidentiary hearing. *Id.*

Consistent with Justice Weimer's conclusion, and after Petitioner filed the instant Petition, the undersigned held an evidentiary hearing on June 25, 2013.  [doc. # 15].  The court heard testimony from Petitioner's witnesses: Allyson Annette Hudson, John Carlisle, Patricia Earline Dykes, and George Ellis Blount.  [doc. # 18].  Respondent called no witnesses.  *Id.*

At the evidentiary hearing, juror Hudson testified that while serving as a juror, she became upset because she suspected that her boyfriend was cheating on her with another woman. *Id.* at 14.  As a result of that concern, and while the trial of the case was ongoing, Hudson went to a residence where she suspected that her boyfriend was with the other woman.  *Id.* at 10.  Hudson admitted that when she went to that residence, she was carrying a baseball bat,  she saw the other woman inside the house, and she threatened the other woman.  *Id.* at 12, 13.  Hudson testified that this event happened on a Friday evening, and that jury deliberations began two days later, on a Sunday.  *Id.* at 16.  While the testimony of John Carlisle (summarized below) indicated that the event occurred on a Saturday lunch recess rather than on Friday evening, the distinction is immaterial.[1]  Without doubt, the event occurred toward the latter stages of the trial, at a time when Hudson was well aware that Bobby Ingram was asserting the defense of justifiable homicide based on a shooting that occurred during the course of a home invasion.

_____

[1] [doc. # 18, p. 26].

Juror Hudson, who acknowledged that she had been interviewed by the State regarding her actions,[2] attempted to mitigate her conduct in two respects.  First, although Hudson admitted that she threatened her boyfriend's paramour with a baseball bat, she claimed that she did not "make it inside the house."[3]  Thus, while she acknowledged engaging in conduct that likely constituted an aggravated assault,[4] she was unwilling to acknowledge that she engaged in an unauthorized entry of the residence.  Hudson also claimed that she only related the event to one other juror because that juror noticed that she (Hudson) was upset.[5]

John Carlisle, who ultimately served as the jury foreman, contradicted Hudson's testimony in major respects.  Carlisle expressly heard Hudson tell other jurors that "she went in that residence with a baseball bat," and then threatened the other woman inside the home.[6]  Carlisle also recalled that Hudson did not merely relate the matter to one other juror, but was "bragging" about the incident to other jurors after the lunch recess on Saturday.[7]  Carlisle also recalled other details of Hudson's account, including: (1) Hudson told other jurors that the subject residence was only a few blocks from the courthouse; (2) Hudson told other jurors that she entered the residence because the front door was open (i.e., not because anyone invited her inside); (3) Hudson told other jurors that she heard noises coming from the bedroom; (4) Hudson

---

[2] *Id.* at 14.

[3] *Id.* at 12.

[4] "Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."  La. R.S. 14:36.  "Aggravated assault is an assault committed with a dangerous weapon."  La. R.S. 14:37(A).

[5] *Id.* at 13.

[6] *Id.* at 25.

[7] *Id.* at 26.

10

told other jurors that she went into the bedroom while armed with a baseball bat; (5) Hudson told other jurors that she caught her boyfriend "in bed" with another woman; and (6) Hudson told other jurors that she threatened the woman.[8]

Another significant aspect of Carlisle's testimony was his recollection that Hudson talked about the situation with her boyfriend to other jurors for several days over the course of the trial.[9] That Hudson talked to the jurors about the situation more than once is corroborated by the testimony of another juror, Patricia Dykes.  Ms. Dykes recalled that one morning during the trial, Hudson stated to other jurors that she had gone to the residence the previous evening, and "should have taken a baseball bat."[10]  Dykes further recalled that the day after Hudson made this statement, Hudson was late arriving for jury duty, prompting another juror to wonder whether Hudson had gone back to the home with a baseball bat.[11]  Given that Hudson has admitted that she did go to the home with a baseball bat,[12] Dykes was likely recalling a statement that Hudson made before the final incident occurred.  Consistent with Carlisle's testimony, Dykes also recalled that Hudson made her comments in the jury room before the commencement of deliberations and in the presence of the other jurors.[13]  After post-hearing briefing, the matter is now before the undersigned.

---

[8] *Id.* at 26-29.

[9] *Id.* at 32.

[10] *Id.* at 35.

[11] *Id.*

[12] *Id.* at 13.  Hudson also told defense investigator Ellis Blount that she went to the woman's house with a baseball bat in order to confront her boyfriend.  *Id.* at 45.

[13] *Id.* at 33-34.

*ii. Relevant Legal Authority & Application*

The Fifth Circuit has stated that "juror bias can come to light in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *U.S. v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (citing *U.S. v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)). In the instant matter, Petitioner's *habeas* Petition hinges on the latter concept of juror bias: implied juror bias.

The landmark case addressing the implied bias doctrine is *Smith v. Phillips*, 455 U.S. 209 (1982). In *Smith*, "the Court . . . held that in most cases the remedy for claims of juror bias is a post-event hearing, in which the trial judge can examine the juror and obtain assurances that, despite the event leading to the claim of bias, the person is able to continue serving as an impartial juror." *Brooks v. Dretke*, 444 F.3d 328, 330 (5th Cir. 2006) (citing *Smith*, 455 U.S. at 217-18)). However, in an oft-cited concurring opinion in *Smith*, Justice O'Connor expressed her concern that there may be certain situations in which "a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice." *Smith*, 455 U.S. at 222. Justice O'Connor stated:

> While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of "no bias," the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.

*Id.*

Based on Justice O'Connor's concurrence, the Fifth Circuit has made clear that the implied bias doctrine is "clearly established Federal law as determined by the Supreme Court."

12

*Brooks*, 444 F.3d at 329.  Therefore, the key inquiry in a case involving a claim of implied juror

bias is "'whether [the juror's] conduct is of the genre of cases Justice O'Connor pointed to in . . .

*Phillips*: juror conduct not salvageable by post event hearings.'" *Id.* at 330 (quoting *Brooks v.*

*Dretke*, 418 F.3d 430, 434 (5th Cir. 2005)).

However, as the Fifth Circuit has stated, "[t]he implied bias doctrine neither starts [nor]

ends with the Supreme Court's decision in *Smith*.  *Id.* (alteration in original).  Although Justice

O'Connor's opinion is illustrative of the circumstances in which implied juror bias may be

found, there is no definitive test and the inquiry is fact-specific.  Accordingly, in order to

determine if Petitioner's claim of implied juror bias is well-founded, it is necessary to examine

related Fifth Circuit jurisprudence on the issue.

In *Brooks v. Dretke*, a juror was arrested for carrying a gun into the courthouse on the day

the defendant's death penalty sentencing hearing began.  *Dretke*, 418 F.3d at 431.  Because the

juror could have been charged with a felony by the same prosecutor seeking the death penalty in

the trial, the Fifth Circuit concluded that these facts warranted a finding of implied juror bias.  *Id.*

at 434-35.  The *Brooks v. Dretke* panel also cited to *Remmer v. U.S.*, 347 U.S. 227 (1956), in

which bias was alleged based on the fact that a juror was offered a bribe during the trial.  *Id.* at

433-34.  In *Remmer*, the Supreme Court concluded that neither "the juror nor anyone else could

say that he was not affected in his freedom of action as a juror."  *Remmer*, 350 U.S. at 381.

According to the *Brooks* court, "*Remmer* illustrates that there are certain factual circumstances,

as illuminated by Justice O'Connor's concurring opinion in *Smith*, in which no reasonable person

could not be affected in his actions as a juror and in which the Constitution refuses to accept any

assurances to the contrary."  *Brooks*, 444 F.3d at 331.  Consequently, the *Brooks* court reasoned

that "[t]he prosecutor's power over [the juror] presented an intolerable risk, one that denied [the

defendant] his constitutionally entitled impartial jury" and that, in accordance with the AEDPA, the state court decision finding no implied bias was objectively unreasonable.  *Id.* at 332 (alterations in original).

In contrast to *Brooks*, the court in *Solis v. Cockrell*, 342 F.3d 392 (5th Cir. 2003), found no implied juror bias.  There, one of the jurors mentioned during deliberations that he had known the defendant for twenty years and that the defendant and his brothers had been known to break into people's homes.  *Id*. at 393-94.  Despite questions directed to the jury venire about whether he was related to or knew anything about the defendant, the juror did not inform the court of his knowledge of the defendant.  *Id.* at 393.  The Fifth Circuit rejected the claim of implied bias resting only on the fact that the juror was exposed to information prejudicial to the defendant outside the courtroom; as the court described it, the juror had simply "heard outside rumors about the defendant's criminal behavior . . . ."  *Id.* at 398.  In coming to this conclusion, the court explained:

> [L]ooking to other cases embracing the implied bias doctrine, we find that most have done so because the juror had a close relationship with one of the important actors in the case or was otherwise emotionally involved in the case, usually because the juror was the victim of a similar crime.  Noting this delineation, some courts have cautioned that bias should not be inferred unless the facts underlying the bias are such that they "would inherently create in a juror a substantial emotional involvement, adversely affecting impartiality."  In such cases, a defendant may show that a trial court's attempts to determine whether the juror is actually biased inadequately protect the defendant's right to a fair trial, because the allegedly prejudicial circumstances may be affecting the juror in ways the juror may not realize or may cause the juror to knowingly withhold the truth from the inquiring court.

*Id.* at 398-399 (quoting *U.S. v. Powell*, 226 F.3d 1181, 1188-89 (10th Cir. 2000)).  Accordingly, in light of the finding that there was nothing to suggest that the juror had a motive to lie to the court or any emotional involvement that would have influenced his decision regarding the defendant's guilt or innocence, the court concluded this was not an "extreme situation"

14

warranting a finding of implied juror bias.  *Id.* at 399-400.

In the instant case, the Louisiana Supreme Court majority distinguished the Fifth Circuit decision in *Brooks*, finding that Petitioner "makes no claim that Juror No. 8 had been arrested following her unauthorized entry and thus faced an actual conflict of her duties as a juror and her self interest in resolving her own difficulties with the state."  *Ingram*, 57 So. 3d at 305.  Additionally, the court identified other "more potent sources of potential bias that ultimately did *not* result in [Juror No. 8's] exclusion from the jury panel," such as the fact that she had been previously arrested, the ADA in Petitioner's case was the same ADA that prosecuted her, and she had been in an abusive domestic relationship.  *Id.*

However, in *Brooks v. Dretke*, the Fifth Circuit held the fact that "there [was] no evidence that the District Attorney did anything to exploit his power over [the] juror . . . [was] of no moment.  That the power presents an intolerable risk of working its will without the raising of a hand or nod is the vice here."  *Dretke*, 418 F.3d at 435 (alterations in original).  In other words, the Fifth Circuit was unconcerned with whether the juror was actually arrested, charged, or actively being prosecuted, as the central concern of the court was the District Attorney's discretionary power to do so at some indefinite time and the impact this had on the juror's impartiality.

Despite Hudson's attempt to downplay her actions and the impact her comments had on the jurors, it is clear that at least Mr. Carlisle, the jury foreman, believed that she was implicitly "prejudiced" and "putting herself in the same position as" the victim.  [doc. # 18, p. 2].  Based on Hudson's own admissions and testimony, Mr. Carlisle's testimony and sworn affidavit, and Ms. Dykes' testimony, the Court finds that Hudson committed at least one crime during the course of the trial, less than two days before jury deliberations.  Namely, Hudson took it upon herself to

15

obtain a weapon (the baseball bat), to enter the home of a complete stranger, and to threaten her then boyfriend and the woman whose residence Hudson entered.  After committing the home invasion and threatening her boyfriend and his paramour with a potentially deadly weapon, Hudson, living to tell about it, returned to the jury room and shared her experience with at least one other juror.[14]   Hudson was not arrested for her crimes; however, she unquestionably committed at least one crime and was subject to prosecution by the same District Attorney who was prosecuting Petitioner.  Analogous to the juror in *Brooks*, Hudson's future was in the hands of the District Attorney's office.  She could have been facing felony charges, and with her prior conviction of misdemeanor theft she could have been sentenced to at least one year in jail if the District Attorney had initiated criminal proceedings.  Thus, it was an unreasonable application of clearly established federal law for the Louisiana Supreme Court to distinguish *Brooks* on the fact that Hudson had not actually been arrested at the time of trial.

The case for *habeas* relief is even more compelling here than in *Brooks* because the crime committed by Hudson was similar in nature to the one committed by the victim before she was killed.  In fact, Petitioner's main defense during trial was that the homicide was justifiable because it occurred when the victim made an unauthorized entry into Petitioner's home and attacked his wife.  As Petitioner aptly contends, "[m]ere hours before the lawyers began their closing arguments . . . Hudson had herself made an authorized entry of a residence and threatened . . . its occupants with a weapon."  [doc. # 19, p. 13].  In response, the State argues that Hudson's remarks "did not change . . . [the other jurors'] mind[s] or belief that Mr. Ingram shot and killed his [ex-]wife during a domestic incident."  [doc. # 20, p. 8].  However, the issue that the jury had

---

[14] However, there is testimony that all of the jurors actually overheard Hudson describe the events to Ms. Dykes.  *Id.* at 34.

to decide was not whether Petitioner actually shot and killed his ex-wife; rather, the issue was whether Petitioner's actions were justified in light of the victim's entry and assault of Petitioner's current wife.

Further, the testimony reveals that this incident was so well known by Hudson's fellow jurors that it was discussed during deliberations when the jury should have instead been determining Petitioner's fate.  Therefore, at a time when the jury should have been considering the evidence, they were distracted by Hudson's crimes and swayed by her experience as they discussed the similarities between her actions and the instant case.  This was initially observed by Mr. Carlisle, compelling him to voluntarily contact defense counsel to report Hudson's apparent "prejudice."  As the appellate court determined, the jury's fact-finding process was seriously compromised, undermining "the public's confidence in the criminal justice system."  *Ingram*, 47 So. 3d at 1134.

The Supreme Court has emphasized that a criminal defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."  *Parker v. Gladden*, 385 U.S. 363, 366 (1966).  The undersigned finds that the facts underlying Hudson's bias are such that they would inherently create a "substantial emotional involvement" adversely affecting her ability to remain impartial, and that her conduct is "not salvageable by [a] post event hearing."  Even if she claimed she could be unbiased, Hudson's misconduct simply precludes a finding that she was able to judge Petitioner with the required qualities of indifference and impartiality that we, as a society, expect from a juror.  Had the incident occurred and been disclosed prior to voir dire, it would clearly have served as a basis to grant a challenge for cause, despite any claims by Hudson that the event would not affect her ability to be impartial.  Accordingly, the Louisiana Supreme Court's conclusion to the contrary constitutes an objectively unreasonable application of the

17

doctrine of implied bias, and Petitioner is therefore entitled to federal *habeas corpus* relief under

the AEDPA.  The undersigned recommends that the Petition for *habeas corpus* relief on this

ground be **GRANTED** and the matter be **REMANDED** to the 26th Judicial District Court, Parish

of Webster, for a new trial or for further proceedings not inconsistent herewith.

B. Claim Two: Right to Confront Witnesses

Petitioner next claims that his right to confront and cross examine a key witness was

violated when the trial court allowed Dr. Frank Peretti to testify about the results of a laboratory

test that Dr. Peretti did not perform.  [doc. # 1, p. 24].  The test was performed in order to

ascertain whether there were any illegal narcotics in the victim's system at the time of death.  *Id.*

The lab technician who performed the test did not testify; consequently, Petitioner argues that he

was unconstitutionally denied his right to cross-examine the technician.  *Id.*

 In *Melendez-Díaz v. Mass.*, a prosecutor sought to admit "certificates of analysis" that

showed that a substance found in the defendant's possession was cocaine.  *Melendez-Diaz v.*

*Mass.*, 557 U.S. 305, 308 (2009).  The certificates were sworn to by analysts at a state laboratory.

*Id.*  The trial court allowed the certificates, even though the forensic analysts who tested the

substance did not testify.  *Id.* at 309.  The Supreme Court held that the admission of certificates

of analysis violated the Confrontation Clause because they fell into the "core class of testimonial

statements" identified in *Crawford*.  *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford v.*

*Wash.*, 541 U.S. 36, 51 (2004)).  The State's failure to produce the expert witnesses for

cross-examination constituted a violation of defendant's right of confrontation.  *Id.*; *see also*

*Bullcoming v. N.M.*, 131 S. Ct. 2705 (2011) (fact that analyst who neither participated in nor

observed the testing testified rather than analyst who actually performed testing, constituted a

violation of petitioner's right of confrontation).

Based upon the above, this Court finds that the trial judge, by virtue of his admission of

Dr. Peretti's testimony, violated the Confrontation Clause.  However, "Confrontation Clause violations are subject to harmless error analysis." *Fratta v. Quarterman*, 536 F.3d 485, 507-508 (5th Cir. 2008) (citing *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988)).

In this case, the Louisiana Second Circuit Court of Appeal concluded that "[e]ven if the trial court erred . . . such error was harmless . . . ." *State v. Ingram*, 71 So. 3d 437, 447 (La. App. 2 Cir. 2011).  The court reasoned:

> In determining whether the error was important in the prosecution's case, one must focus on the elements of the charged crime. See Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. Notably, the lab report in Melendez–Diaz was directly connected to the charges against that defendant and a crucial piece of evidence against him. Here, the State's burden of proving its case against Ingram did not include proof that the victim was drug or alcohol free, so the lab report did not prove an essential element of the case as it did in Melendez–Diaz. Because the presence or absence of drugs in the victim's body was not an element of the offense, the harm to the defendant from this error is none.
>
> Moreover, we note that although Ingram argues that the State emphasized the "no drugs" fact to the jury in proving that the shooting was not justified, it hardly appears that the State's "no drugs" argument was emphasized. In fact, the evidence on this point is minuscule compared to the body of evidence against Ingram. Additionally, we fail to see how proof that Kim was drug or alcohol free even goes to the reasonableness of Ingram's action when considering all of the other evidence against him. Regardless of whether Kim was on drugs or not, she was still a woman, smaller than Ingram, and he knew she was unarmed. Considering the actual facts of this case, it is apparent that the jury had enough evidence to reach its conclusion that Ingram's actions were not reasonable regardless of this drug report, making its admission into evidence harmless.

In sum, the Court finds that the Louisiana Second Circuit's analysis does not constitute an unreasonable application of Supreme Court law to the facts of this case.  The court did not run afoul of the Supreme Court's decision in *Melendez–Diaz*.  Thereafter, the court properly engaged in a harmless error analysis, in accordance with the Supreme Court decisions in *Coy v. Iowa*, and *Del. v. Van Arsdall*.  Accordingly, it is recommended that Petitioner's claim on this basis be **DENIED.**

C. Claim Three: Insufficient Evidence

For Petitioner's third claim, he argues that the evidence was insufficient to prove the elements of the crime of manslaughter.  [doc. # 1, p. 34].  Petitioner claims that the State failed to prove beyond a reasonable doubt that Kim Ingram was not engaged in an unlawful forcible entry of his residence at the time the homicide occurred.  *Id.* at 37.  He argues that because Kim made a forcible entry into his home, his use of lethal force in response was presumed reasonable, and the State did not carry its burden of negating this presumption and proving his guilt beyond a reasonable doubt.  *Id.*

When a *habeas* petitioner asserts that the evidence presented to the trial court was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Va.*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, Petitioner essentially claims that the Louisiana Second Circuit Court of Appeal's decision to reject his claim was objectively unreasonable because it applied the *Jackson* standard to the incorrect state law.  [doc. # 1, p. 36].  In evaluating the sufficiency of the evidence, the *Jackson* standard "must be applied with explicit reference to the substantive elements of the

20

criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16.  Petitioner argues that

his conduct was justified under the provisions of La. R.S. 14:20, which provides in pertinent part:

> A homicide is justifiable:

> * * *

> A. (4)(a) When committed by a person lawfully inside a dwelling . . . against a person who is attempting to make an unlawful entry into the dwelling . . . or who has made an unlawful entry into the dwelling . . . and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises . . . .

> * * *

> B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling . . . held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the premises . . . if both of the following occur:

> (1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling . . . .

> (2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

Petitioner claims that the presumption above is a conclusive, irrebuttable presumption

and therefore the State was required to prove either that Kim Ingram did not unlawfully

and forcibly enter the residence or that Petitioner had no reason to believe that an

unlawful and forcible entry had occurred.  [doc. # 1, p. 37].

However, the state appellate court concluded that the presumption was rebuttable

and that an inquiry into whether Petitioner could have used lesser force was appropriate.

*Ingram*, 71 So. 3d at 445.  Thus, Petitioner claims that the state appellate court

objectively and unreasonably applied *Jackson* because it did not apply *Jackson* to the

correct substantive elements of the criminal offense as defined by state law.[15]

Synthesized, Petitioner claims that the appellate court misconstrued La. R.S. 14:20 and in fact gives forth persuasive reasons why this is so.

Petitioner's persuasive arguments notwithstanding, a state court's construction of its own statute is binding on this Court.  Construction of state statutes is conclusively a matter of state law of which state courts are the final arbiters.  *See N.Y. v. Ferber*, 458 U.S. 747, 767 (1982) ("[T]he construction that a state court gives a state statute is not a matter subject to our review."). "Under § 2254, federal habeas courts sit to review state court misapplications of federal law.  A federal court lacks authority to rule that a state court incorrectly interpreted its own law." *Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011).  It is not the function of a federal court in a *habeas* proceeding to review a state's interpretation of its own law, and this Court must defer to the state courts' interpretation of its statute.  *Rocha v. Thaler*, 626 F.3d 815, 2010 WL 4630794, at *3 (5th Cir. 2010).  In the case at bar, the Court cannot question the Louisiana appellate court's determination that the word "presumption" in La. R.S. 14:20 should be read as creating a rebuttable presumption rather than a conclusive presumption.  This Court's review of the state court's construction of its own statute is limited to deciding whether the interpretation violated the Constitution, laws, or treaties of the United States.  Petitioner has raised no such claim.[16]

--------

[15] Lack of justification is an element of the crime.  *State v. Johnson*, 15 So. 3d 371, 375 (La. App. 2 Cir. 2009).

[16] The only time a federal court may review a state court's interpretation of its statute is when that interpretation is an "obvious subterfuge to evade consideration of a federal issue." *Mullaney v. Wilbur*, 421 U.S. 684, 691 n. 11, (1975).  The *Mullaney* Court cited three cases, which appear to be exhaustive, as instances when a state court's interpretation was not binding on a federal court: *Radio Station WOW v. Johnson*, 326 U.S. 120 (1944); *Ward v. Love County*, 253 U.S. 17 (1919); and *Terre Haute & Indianapolis RR v. State of Indiana ex rel Ketcham*, 194 U.S. 579, 585 (1904).  All three cases involve a state court's determination of matters of exceptional

With that in mind, Petitioner asserts that the state appellate court misapplied federal law when it rebuffed his contention that the rule of lenity requires reversal of his conviction.  [doc. # 1, p. 43].  More specifically, Petitioner asserts that the rule of lenity mandates that he cannot be convicted under a criminal statute that has two possible constructions, even if both constructions are reasonable.  *Id.*  The appellate court rejected Petitioner's contention.  *Ingram*, 71 So. 3d at 444.

But, as above, the Court cannot question the Louisiana court's use (or non-use) of the principle of lenity because the rule of lenity is "a rule of statutory construction, rather than a separate constitutional framework for raising claims." *U.S. v. Rivera*, 265 F.3d 310, 312 (5th Cir. 2001); *U.S. v. Santos*, 553 U.S. 507 (2008).  While Louisiana has adopted the rule of lenity, whether that state statute applies to Petitioner's situation is a question of state law which this Court may not consider.

At this juncture, it is clear that the Louisiana Second Circuit Court of Appeal's decision to reject Petitioner's claim was not objectively unreasonable because, as Petitioner essentially argues, it applied the *Jackson* standard to the incorrect state law.  Again, this Court cannot question whether that court construed the state law correctly.  Nevertheless, the question still remains–although Petitioner does not directly raise it–whether the court of appeal's decision to reject Petitioner's claim was objectively unreasonable assuming, as the Court must, that the appellate court applied the *Jackson* standard to the correct state law.

Assuming that the appellate court applied the *Jackson* standard to the correct state law, it is evident that the appellate court was not objectively unreasonable in determining that a rational

---

federal importance.  For instance, *Radio Station WOW* involved a state court decision that restricted jurisdiction of the Federal Communication Commission.  *Ward* involved a state court decision that effectively taxed Indian lands which were exempt from taxation.  Finally, *Terre Haute* involved a state court decision that impaired the contractual rights of a railroad in violation of the United States Constitution.  None of those situations are present here.

trier of fact, viewing the evidence in the light most favorable to the prosecution, could reasonably

conclude beyond a reasonable doubt that Petitioner was not justified in committing homicide.

The appellate court concluded that the presumption in La. R.S. 14:20 can be rebutted "[if] the

State can prove beyond a reasonable doubt that the use of force was unreasonable . . . ." *Ingram*,

71 So. 3d at 445.  In considering the evidence bearing on Ingram's justification for shooting Kim,

the appellate court stated that

> the jury heard the testimony of the two living witnesses to the event and saw
> the photos of the crime scene and the victim, so they were aware of the relative
> physical sizes of Ingram and Kim. The jury heard testimony that Ingram was angry
> with Kim as the result of a letter he received that day from her attorney related to the
> couple's community property settlement. Likewise, the jury heard the recordings of the
> 911 calls from Ingram that included his statement that Kim had no weapons that he
> knew of, but that he was going to have to "do something" if she came into the house.
> Further, the jury heard the testimony of the experts retained by both sides who gave
> their opinions about the victim's position at the time of the fatal shot, with the State's
> expert opining that Kim was in a "defensive" position when she was shot. As the State
> points out, there are many levels of force less than deadly force that Ingram could have
> used once he saw Kim and had the opportunity to discover that she was unarmed.
> Instead, Ingram responded to Kim's unarmed assault on Nancy with grossly
> disproportionate force that ended Kim's life. The evidence was sufficient to prove
> beyond a reasonable doubt that the use of deadly force under the circumstances was
> unreasonable and that the defendant is guilty of manslaughter.

At bottom, viewing La. R.S. 14:20 through the appellate court's lense, and given the

evidence at trial, the undersigned cannot say that the state court's application of *Jackson* was

objectively unreasonable; therefore, it is recommended that Petitioner's claim on this basis be

**DENIED**.

D. Claim Four: Non-Unanimous Verdict

Petitioner's final claim is that the lack of a requirement of a unanimous verdict denied

him his fundamental right to trial by jury and due process of law, as guaranteed by the U.S. and

Louisiana Constitutions.  [doc. # 1, p. 44].

Non-unanimous jury verdicts for twelve person juries are not unconstitutional.  *Apodaca*

24

*v. Or.*, 406 U.S. 404 (1972).  Notably, in *Johnson v. La.*, the Supreme Court upheld Louisiana's statute authorizing a verdict of only 9 out of 12 jurors in a non-capital criminal case. *Johnson v. La.*, 406 U.S. 356 (1972).

Petitioner can obtain *habeas* relief on this claim only if the state court adjudication was contrary to or involved an objectively unreasonable application of "clearly established federal law, as determined by the Supreme Court of the United States."  Section 2254(d).  To be sure, the justices were unusually divided in their approaches in *Johnson* and *Apodaca*.  *See McDonald v. City of Chi.*, 130 S. Ct. 3020, 3035 n. 14 (2010) (describing the various opinions).  Some legal scholars take the position that subsequent Supreme Court decisions that discuss how the Bill of Rights apply to the states have undermined *Johnson* and *Apodaca*, but the Supreme Court has thus far denied certiorari in cases that sought to overturn those precedents.  *See e.g., Barbour v. La.*, 131 S. Ct. 1477 (2011) and *Herrera v. Or.*, 131 S. Ct. 904 (2011).  When Supreme Court precedents exhibit a lack of clarity about the applicable principle, obtaining *habeas* relief can be difficult.  *See Lockyer v. Andrade*, 123 S. Ct. 1166 (2003).

Here, the Supreme Court decisions available on non-unanimous juries support the appellate court's decision.  Petitioner was convicted by a jury verdict of 10-2.  [doc. # 1, p. 45].  Specifically, he was convicted of manslaughter, a crime which requires confinement at hard labor.  *See* La. R.S. 14:31.  When punishment is necessarily confinement at hard labor, Louisiana law provides that the case "shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict."  La. C. Cr. P. art. 782.  In sum, neither La. C. Cr. P. art. 782 nor the concomitant verdict rendered at trial is unconstitutional.  Thus, the appellate court's decision was not contrary to or an objectively unreasonable application of clearly established Supreme Court precedent.  Therefore, it is recommended that *habeas* relief on this claim be **DENIED**.

**CONCLUSION**

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Bobby Ray Ingram, II [doc. # 1] be **GRANTED** on the basis that he was denied trial by an impartial jury, and that the matter be **REMANDED** to the 26th Judicial District Court, Parish of Webster, for a new trial or for further proceedings not inconsistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28

U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 17th day of September, 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

27